FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 00 FEB 22 AM 9: 51
WESTERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

DOROTHY A. McQUEEN,                          )
                                             )
            Plaintiff,                       )
                                             )
v.                                           ) CIVIL ACTION NO. 98-PWG-0372-W
                                             )
INTEGRATED HEALTH SERVICES, INC.,            )
ET AL.,                                      )                    **ENTERED**
                                             )
            Defendants.                      )              FEB 2 2 2000

## MEMORANDUM OF OPINION

This matter is before the court on defendant's Motion for Summary Judgment (document #30) pursuant to 28 U.S.C. § 636(c). Dorothy A. McQueen, plaintiff, filed this action against defendants Briarcliff Nursing Center, Inc. and Integrated Health Services, Inc., the parent company of Briarcliff, asserting several Title VII claims and state law claims against defendants.[1]

## STANDARD OF REVIEW

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that

---

[1] Plaintiff had also named various individual defendants. On December 21, 1998, one day prior to the date that defendants' motion for summary judgment was due, plaintiff filed a motion to dismiss the individual defendants in this case. (Document #29). This action was dismissed with prejudice as to the individual defendants on January 12, 1999. (Document #33).

he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.

1991). Once that initial burden has been carried, however, the non-moving party may not merely

rest upon his pleading, but must come forward with evidence supporting each essential element of

his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who

carries the ultimate burden of proving his action, is able to show some evidence with respect to each

element of his claim, all other issues of fact become immaterial and the moving party is entitled to

judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*,

898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the
> plaintiff fails to establish a prima facie case. "In such
> a situation, there can be `no genuine issue as to any
> material fact,' since a complete failure of proof
> concerning an essential element of the non-moving
> party's case necessarily renders all other facts
> immaterial." [Citation omitted]. Thus, under such
> circumstances, the public official is entitled to
> judgment as a matter of law, because the plaintiff has
> failed to carry the burden of proof. This rule
> facilitates the dismissal of factually unsupported
> claims prior to trial.

898 F.2d at 1532.

The following relevant facts are undisputed or, if disputed, viewed in the light most

favorable to plaintiff.

Plaintiff first became employed by Briarcliff in November 1994 in the position of

LPN. (Amended Complaint, Answer to Amended Complaint ¶ 19). Plaintiff worked PRN (as

needed) while she was in school. PRN nurses earn a higher hourly rate than full time nurses.

2

When plaintiff obtained a temporary RN license in November 1995, she requested a full time RN position, but she was told that she would have to pass the boards before she could assume a full time RN position. (McQueen deposition, pp.55-58).

Earlier in 1995 two white RNs, Lynn Rasco and Tedra Mims, and a black RN, Betty Talley, were allowed to work as full time RNs with temporary licenses. (Rasco deposition, pp.18-19). These RNs obtained their temporary licenses several months before plaintiff did. (McQueen deposition, pp.58-59; Rasco deposition, pp.17-18). By late 1995, when plaintiff obtained her temporary license and Gail McClellan went to the Medical Surgery Unit (MSU) as clinical coordinator, the policy had changed so that nurses could not work with temporary licenses. (McClellan deposition, pp.47-49). Mindy Brasher, a white nurse, testified that from January through February 1998 she "was working with LPN pay as an LPN until [she] passed [her RN] boards." (Emphasis added). (Brasher deposition, p.21).

In January 1996, plaintiff filed an EEO complaint which was lost and never resolved. In the lost EEO complaint, plaintiff alleges that she was not allowed to work a full-time registered nurse position with her temporary license even though two white registered nurses were allowed to do so while drawing registered nurse salaries. (Defendants' Exhibit 6 at pp.65-70).

Plaintiff was offered and accepted a full time position in March 1996 and expected to be paid $18 per hour but was instead paid $16 per hour in her first paycheck. Plaintiff requested and was paid at the higher PRN rate for the hours worked and returned to PRN status. (McQueen deposition, pp.72-78). At all times, plaintiff was paid at a rate consistent with that of other PRN RNs. (McQueen deposition, pp.76-77).

3

On December 10, 1996 plaintiff filed an EEO complaint alleging:

> On December 10, 1996 the above named employer denied me the opportunity to obtain a full time registered nurse position. I was also denied wages equal to that paid similarly situated White employees. I have been employed by the employer for approximately two years. I am currently employed as a P.R.N. Registered Nurse.
>
> I was informed by Sharon Godwin, D.O.N. of Nursing, that I would not receive a full time position because there were no positions available. She also told me that the salary I received was based on my being a recent R.N. graduate.
>
> I believe that I was discriminated against in violation of the 1964 Civil Rights Act, as amended, because of my race, Black.

(Defendants' Exhibit 7).

On the complaint form plaintiff indicated that the discrimination took place from September 4, 1996 through December 10, 1996.

This charge was filed after a white employee, Danny McHarry, was moved into a full time position in MSU after plaintiff had been told there were no full-time positions available. (Amended complaint, ¶¶ 24, 25; McQueen deposition, p.78). Mr. McHarry occupied a full time RN position while acting as MDS Coordinator, and he was moved to a full time RN position in MSU. (L. Smith deposition, pp.45,55-57). While his duties changed from handling paperwork to providing patient care, his full-time status did not change and his shift did not change. (L. Smith deposition, p.57). When plaintiff again inquired in December 1996 she was told that there were no positions available. (Exhibit 4 to McQueen deposition).

4

Linda Smith, Director of Nursing, testified that plaintiff inquired about assuming a full time position on various occasions, continuing through August 1997; however, plaintiff would ultimately decide that she would rather continue on PRN status, largely because she was paid a higher hourly rate. (L. Smith deposition, p.460). Plaintiff also had concerns about whether she could work in other positions if she assumed a full time position; plaintiff was told that she could not do so. (Document Bates No. 148; L. Smith deposition pp.46-47).

Plaintiff was interviewed for and accepted a full time position in around August 1997. Plaintiff then changed her mind because she was told that she would not be able to work in another position (house supervisor) as well. When plaintiff complained that her pay would be decreased (consistent with moving from PRN to a full time position), Briarcliff management agreed to keep plaintiff's pay at the higher PRN rate and to allow her to work in the house supervisor position. (McQueen deposition, pp.158-163).

On September 15, 1997 plaintiff and Ms. Schrader, a white LPN, were involved in a confrontation about who was going to work which unit. Ms. Schrader kicked a chair and called plaintiff a "bitch."[2] Plaintiff called Schrader a "white whore" and threatened to "ring [Schrader's] neck," and, later, to take the matter up off company property if Schrader ever called McQueen a bitch again. (Exhibit 6 to McQueen deposition; McQueen deposition, pp. 166-167, 173-175, 177-

---

[2]      In her deposition testimony, plaintiff testified that Schrader called her a "black bitch;" however, she later testified that she only heard the word "bitch" and that Linda Jackson told her that Schrader had called her a "black bitch." (Defendants' Exhibit 6, pp.167,173,174,178). According to the statement of Linda Jackson, Schrader called plaintiff a "black bitch." (Plaintiff's Exhibit 12, p.2). Immediately after the incident, plaintiff, Schrader, Linda Jackson and A. Hughes all prepared statements concerning the incident and all indicated that Schrader called plaintiff "a bitch." (Defendants' Exhibit 8, 000166-170, 000175-176). In her statement prepared immediately after the incident Jackson wrote that Schrader "called Ms. McQueen a bitch (Quote) You Bitch)." Plaintiff in the response to the motion for summary judgment states "The white nurse called plaintiff a bitch." (Response, unnumbered p.6).

5

180; Documents Bates 000163-182, attached to Clements Affidavit as Exhibit A). Both plaintiff and

Ms. Schrader were terminated on the basis that the conduct constituted a Category One Violation

for which the employees could be terminated without progressive discipline.

Bill Smith told plaintiff that because she had complained to the EEOC, her action had

"some bearing" on him making his decision to terminate her. (Amended complaint, ¶ 31 and ¶ 53;

McQueen deposition, p.197).[3]  Given the severity of the conduct, plaintiff, like Ms. Schrader, would

have been terminated regardless of consideration of any other factors. (Clements affidavit, ¶ 15; B.

Smith deposition, pp.18-19,44-45).

On September 23, 1997 plaintiff filed a second EEO complaint alleging:

> I was employed by the employer named above
> approximately three years ago. On September 22,
> 1997, I was discharged from my position as a
> Registered Nurse.
>
> Andy Clements and Bill Smith, managers, told me
> that I was being discharged for allegedly threatening
> a White Licensed Practical Nurse after she called me
> a bitch. They (Clements and Smith) also told me that
> I was being discharged, in part, because I sought
> advice from the SCLC about my employment
> problems.
>
> I believe that I have been discriminated against in
> violation of Title VII of the Civil Rights Act of 1964,

---

[3]  In the amended complaint plaintiff also alleged that Smith told her that her complaint to the SCLC (Southern Christian Leadership Conference) had some bearing on the decision to terminate her. Smith and Clements deny that any such statement was made. Smith and Clements also deny that they knew anything about SCLC involvement until after plaintiff's termination. (Clements affidavit, ¶ 15; B. Smith deposition, pp.52-53, 57, 61). There has been no evidence submitted that Smith and Clements knew of SCLC's involvement when they terminated plaintiff. Further, the portion of plaintiff's deposition (McQueen deposition, p. 195) submitted to the court does not indicate that Smith and Clements told plaintiff that her contact with the SCLC had any bearing on the decision to terminate her employment. Rather, she testified that Smith told her that the fact she went to the EEOC "had some bearing on" the decision to terminate her employment.

>as amended, because I filed a previous charge of
>discrimination (Charge Number 130970843) against
>the employer.   I also believe that I have been
>discriminated against, in part, because I sought advice
>from the SCLC about employment-related matters
>which I considered to be racially discriminatory.

(Defendants' Exhibit 7).

I.      Disparate Treatment

Plaintiff has set forth four disparate treatment race discrimination claims:

A.      Refusal to Allow Plaintiff to Work Full-time and at $18.00 an hour with a
        Temporary License;

B.      Unequal Pay;

C.      Denial of Full-time Employment to Plaintiff While Making it Available to a
        White Male Nurse;

D.      Denial of Financial Assistance.

Because there is no direct evidence of race discrimination, the McDonnell Douglas/Burdine

framework is the applicable analysis. *Combs v. Plantation Patterns*, 106 f.3d 1519, 1527 (11th Cir.

1977), *cert. denied,* 522 U.S. 1045 (1998). The plaintiff bears the initial burden of establishing a

*prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To

establish a *prima facie* case of disparate treatment plaintiff must show that (1) she is a member of

a protected class, (2) was similarly situated with a person outside of the protected class, but (3) was

denied a condition of employment afforded that person. *Thompkins v. Morris Brown* College, 752

F.2d 558, 562, n.7 (11th Cir. 1985), *citing McDonnell Douglas Corp.,* 411 U.S. at 802-03, n.13. If

a plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a

legitimate nondiscriminatory reason for its action. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 257-58 (1981). Once this burden is met, plaintiff must demonstrate by a preponderance of the evidence that defendant's reason is pretextual.

As discussed below, plaintiff has failed to establish a *prima facie* case with respect to any of her claims of disparate treatment because she has failed to show that she was similarly situated with a person outside of the protected class.

A.   Refusal to Allow Plaintiff to Work Full-Time
     and at $18.00 an Hour With a Temporary License

Plaintiff alleges that she was not allowed to work full-time as a registered nurse with her temporary license as two white employees were allowed to do. She further alleged that these employees were paid a starting salary of $18 an hour and were granted full-time status. (See amended complaint, ¶ 21). It is undisputed that the two white nurses who were allowed to work full-time as registered nurses with their temporary licenses did so, along with a black nurse, earlier in 1995. By the time plaintiff received her temporary license, Briarcliff policy was that nurses were not allowed to work as full-time registered nurses at RN salary with temporary licenses. Plaintiff has not presented any evidence that the new policy was not applied equally to black and white nurses.

B    Unequal Pay

In her amended complaint plaintiff alleged:

> [I]n the Spring of 1996, Plaintiff passed the State Registered Nurse Board exam. Plaintiff further alleges that she petitioned the Defendants again for a full time position. Plaintiff was granted a full time position in MSU but was told by the clinical coordinator, Gayle McCullan, [sic] that her starting

8

> salary would be eighteen dollars hourly. Plaintiff
> received [her] first payroll check which was the
> Plaintiff's first notice that she was being paid only
> sixteen dollars hourly. When Plaintiff complained of
> the pay rate of sixteen dollars/hourly, Plaintiff was
> told by management that the pay rate for registered
> nurses had been lowered from eighteen dollars/hourly
> to sixteen dollars/hourly. Plaintiff further alleges that
> because the Defendants denied her the hourly pay rate
> of eighteen dollars, Plaintiff requested to go back to
> PRN status where she could make more per hour but
> had no benefits.
>
> Plaintiff alleges that after the defendants denied her
> the pay rate of eighteen dollars/hourly, the defendants
> then hired other white nurses and paid the white
> nurses eighteen dollars/hourly.   Plaintiff further
> alleges that she was required to train one of the white
> nurses, namely Kathy Booth.
>
> Plaintiff alleges that in November 1996, it became
> knowledgeable [sic] to her that other white nurses
> with less experience had been hired at a higher pay
> rate of eighteen dollars/hourly.   Plaintiff, then,
> reapplied for a full-time position in MSU only to be
> told by Sharon Godwin, the interim Direct of Nursing,
> that there was no full time position available.

In her response, plaintiff alleges:

> when she was promoted to a full-time registered nurse
> [in March 1996] she was paid a lower wage than her
> white counterparts. A white female testified that she
> was allowed to work as a registered nurse with a
> temporary license and was paid $18.00 an hour before
> and after she received her permanent license.

(Plaintiff's Response, unnumbered p.12).

Plaintiff apparently relies on the deposition testimony of Lyn Rasco. (Plaintiff's Response,

unnumbered pp.2-3). However, plaintiff testified that Rasco graduated earlier in 1995.

In her deposition, plaintiff testified that she was told that she would make $18.00 an

hour as a full-time RN; however, when she received her first paycheck, she only received $16.00 an

hour.  She testified:

A.     I went to Gail and she said she don't know why they didn't pay me eighteen. So then I went to Wilma Scott.  I was very upset, and then she – she said "Dot," she said, "we can't pay you eighteen an hour."  She said, "The rate of pay now is sixteen an hour."  I said, "That's not what Gail told me.  She told me it was eighteen."  She said, "We can't pay you eighteen.  We're going to have to pay you sixteen dollars an hour."  I said, "I'm not taking sixteen dollars an hour."

I mentioned she had paid, you know, other white RNs sixteen [sic] dollars an hour.  They didn't have any more experience than I had.  I also mentioned about Tedra or Lynn at that point.  I said, "I tell you what you do, you go back for every hour that I worked full time and you pay me my PRN rate of pay."

Q:     Did they do that?

A:     Yes.

Q:     Now, is it your testimony that you believe that others with similar experience to you were making eighteen dollars an hour at that same time or were they making sixteen?

A:     Eighteen.

Q:     Who are we talking about?

A:     That's where I mentioned Kathy Booth, because I know she was making eighteen.  But I was told that they didn't hire anyone after that period that was making eighteen dollars an hour.

Q:     Okay.  So they were indicating – now, Kathy Booth had been hired before you started working full time?

A:     Now, I'm not sure now.  I'm not sure, but I found out later on in the year that she was making eighteen.  I didn't find out right there.  I'm not even sure if she was there then, but I found out later on in the year that she was making eighteen.

10

(Defendant's Exhibit #6, pp.74-75).

Plaintiff has failed to present any evidence that when she was hired full-time in March 1996 that Briarcliff had not decreased the rate of pay of RNs to $16.00 nor has she identified a similarly situated white employee who would have been newly hired as a full-time RN at approximately the same time as plaintiff who received $18.00 an hour rather than $16.00 an hour. Further, after expressing concern over the amount of her pay check and a desire to return to PRN status, plaintiff was paid $20 an hour rather than $16 an hour for that time period which was a rate consistent with that of other PRN registered nurses. (Defendant's Exhibit 6, pp.231-32). Plaintiff has not alleged that racial discrimination played a role in whether a nurse was hired as PRN or registered nurse.

C.    Denial of Full-time Employment to Plaintiff
      While Making it Available to a White Male Nurse

Plaintiff alleges that she was denied full-time employment as an RN but defendants made full-time employment available to a white male nurse, Danny McHarry. (See plaintiff's response, unnumbered p.5). Danny McHarry was moved into a full-time position after plaintiff had been told there were no full-time positions available. (McQueen deposition, p.78). Subsequent to Mr. McHarry's move, plaintiff was again told there were no positions available. (Exhibit 4 to McQueen deposition). McHarry was always a full-time RN and remained on the same shift when he changed duties from handling paperwork to providing patient care. McHarry, who was already a full-time RN when he was transferred to MSU was therefore not similarly situated with plaintiff was an PRN at the time she was seeking a full-time position.

11

D.     Denial of Financial Assistance

In the amended complaint plaintiff alleged:

> [T]he Defendants had available financial assistance
> for educational advancement for its employees.
> Plaintiff states that she (a black and minority) and
> other white employees went to defendants Khrys
> Kartarze and Dot Russick and requested financial
> assistance for educational advancement. Plaintiff, a
> black and minority, states that the Defendants assisted
> white employees but denied her request because of
> her race.

This claim was not raised in any of plaintiff's EEO charges.

Plaintiffs are required to exhaust their administrative remedies before bringing suit

under Title VII. *Wu v. Thomas,* 863 F.2d 1543, 1547 (11th Cir. 1989), *cert. denied,* 511 U.S. 1033

(1994). "Strict compliance with Title VII is unnecessary [ ] where the plaintiff has filed a charge

with the EEOC, but in her judicial action the plaintiff raises related issues as to which no filing has

been made." *Id.* The Eleventh Circuit has explained which claims are appropriate and which claims

are not appropriate if they have not been raised in an EEOC filing:

> As long as allegations in the judicial complaint and
> proof are "reasonably related" to charges in the
> administrative filing and "no material differences"
> between them exist, the court will entertain them. As
> we have noted ..., "the 'scope' of the judicial
> complaint is limited to the 'scope' of the EEOC
> investigation which can reasonably be expected to
> grow out of the charge of discrimination."

> Judicial claims which serve to amplify, clarify, or
> more clearly focus earlier EEO complaints are
> appropriate.     Allegations of new acts of
> discrimination, offered as the essential basis for the
> requested judicial review are not appropriate.

*Ray v. Freeman*, 626 F.2d 439, 443 (5th Cir. 1980) (citation omitted) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970). *See Wu*, 863 F.2d at 1547.

In both *Wu* and *Ray*, the courts considered allegations that occurred after the filing of the EEO complaint as corroborative evidence of the claim raised in the EEOC complaint. In this case, however, plaintiff seeks to assert a claim that was not raised in her EEOC complaint and which relies upon facts which were not raised in her EEOC complaint. The court concludes that this claim is not appropriate.

Furthermore, there is no evidence that any white employees received educational assistance during the period plaintiff was in school, late 1994 through late 1995. Mindy Brasher, one employee that plaintiff thought received such assistance actually received assistance in 1992. (Brasher deposition, pp.22-23). While plaintiff also testified that Rhonda Perez received assistance, she did not know when Perez received assistance. (Defendants' Exhibit 6, pp.229-230). Plaintiff testified that she was unaware of anyone receiving assistance during the time she was in school. (McQueen deposition, p.123).

II.     Hostile Work Environment

While plaintiff's complaint includes allegations of a hostile work environment, her EEOC charges did not include any such allegations; therefore, this claim is not appropriate for judicial review. *Wu, supra*. Furthermore, plaintiff has failed to show that she was subjected to a hostile work environment.

The elements plaintiff must prove to succeed on her racially hostile work environment claim are: (1) that she is a member of a protected group; (2) the she was subject to unwelcome harassment; (3) that the harassment was based on race; (4) that the harassment was sufficient severe

13

or pervasive so as to alter the conditions of her employment and create an abusive work environment; and (5) that some basis for employer liability has been established. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986). In determining whether an environment is hostile, the court should consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift System, Inc.*, 510 U.S. 17, 21 (1993).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview." *Harris*, 510 U.S. at 21.

In *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998), the Supreme Court recognized that in considering the objective severity of the harassment, the court must consider all the circumstances, including the social context.

In her amended complaint plaintiff alleged:

> [T]he Defendants allowed white employees to refer to her as a "black bitch" on more than one occasion and that measures taken if any was [sic] minimal to none. Plaintiff alleges that the Defendants failed to correct any and all such unlawful action thereby creating an intolerable and hostile work environment.
>
> Plaintiff alleges that during her employment with Defendant Corporation, black employees were called "niggers" by white employees and that the Defendants did absolutely nothing [to] prevent or correct such unlawful practice.

14

Plaintiff alleges that she met with Defendant James Taylor and Defendant Patrick Duplantis and complained of the unlawful acts but it was to no avail.

On or about December 10, 1996, Plaintiff McQueen filed a Charge of Discrimination on the basis of race with the Equal Employment Opportunity Commission (EEOC) against said Defendants.

Plaintiff alleges that after she filed her EEOC complaint, the defendants created a hostile and oppressive work environment which resulted in a wrongful termination of the Plaintiff. Plaintiff was told by Defendant Bill Smith that Plaintiff filing a complaint with the EEOC and complaining to the SCLC had "some bearing" on his decision to terminate her.

Plaintiff testified that she did not hear any racial remarks at any time during her employment. (McQueen deposition, pp.152, 156-157). Plaintiff testified that prior to the confrontation leading to her termination, Tedra Mims, a white co-worker, called her a "black bitch" more than one time. (McQueen deposition, pp. 130, 139-42). She further testified that Mims cursed "all the time" using the words bitch, goddamn, damn. (McQueen deposition, pp. 140-141). Although Mims cursed plaintiff in front of the supervisor "several times," she never called her a black bitch in front of the supervisor. (McQueen deposition, pp.140-41). She testified that Mims was the only one who ever called her a black bitch. (McQueen deposition, pp. 141-142). She testified that she never heard Mims curse a white person and that the only other black employee she heard Mims curse was Joyce Cunningham; however, she could not recall what Mims said to Cunningham. (McQueen deposition, p.142). She testified that she had never heard the word "nigger" used at Briarcliff; however, she had been told by others of two statements in which the word "nigger" was used. (McQueen deposition, pp. 152, 156-157). Plaintiff argues that a hostile

15

racial work environment can exist in the absence of racially abusive language. (Plaintiff's February 8, 1999 Response, unnumbered pp. 14-15). On February 9, 1999 plaintiff filed a motion to amend plaintiff's response and sought to introduce the statements of Venzola Jones and Queen Dial, former co-workers of plaintiff. Plaintiff alleged that Jones and Dial are African-Americans, that their statements show that African-American nurses were discriminated against because of their race, that their statements support plaintiff's contention of a hostile work environment. Plaintiff did not cite to specific portions of the statements of Jones and Dial as support for the hostile work environment claim. The statements of Jones and Dial are not relevant to plaintiff's hostile work environment claim because their statements only reflect, in a vague and conclusory manner, their own perceptions of the work environment at Briarcliff. Because plaintiff has not introduced any evidence that plaintiff subjectively perceived the environment to be hostile or abusive, there can be no Title VII liability inasmuch as plaintiff has failed to prove a necessary element of her hostile work environment claim–i.e., that the conduct actually altered plaintiff's working conditions as to "make it more difficult to do the job." *Harris v. Forklift Systems*, 510 U.S. 17, 21-25 (1993); *Watkins v. Bowden*, 105 F.3d 1344, 1355-56 (11th Cir. 1997).

III.    Discriminatory Discharge

        In the amended complaint plaintiff alleged that she was wrongfully discharged on the basis of race because a similar incident occurred between two non-minorities and no action was taken by defendants.[4]    (Amended Complaint, ¶ 48).    To establish a *prima facie* case of

---

[4]    She further alleged that she was terminated because plaintiff refused to participate in racial abuse committed against her by a white subordinate and that defendants did not take appropriate steps to support her in a management decision regarding the white co-worker. (Amended Complaint, ¶ 49) Plaintiff has not presented any argument or evidence on these allegations; therefore, they will not be addressed.

16

discriminatory discharge, a plaintiff must show: (1) plaintiff belongs to a racial minority; (2) she

was subjected to adverse job action; (3) her employer treated similarly situated employees of other

races more favorably; and (4) she was qualified to do the job. *Jones v. Bessemer Carraway Med.*

*Ctr.*, 137 F.3d 1306, 1310, *modified on other grounds*, 151 F.3d 1321 (11th Cir. 1998); *Manniccia*

*v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). The only question with regard to this claim is

whether plaintiff has established the third element. The third element is satisfied if:

> [T]he plaintiff [shows] that [she] and the employees
> are similarly situated in all relevant respects .... [cites
> omitted]. In determining whether employees are
> similarly situated for purposes of establishing a prima
> facie case, it is necessary to consider whether the
> employees are involved in or accused of the same or
> similar conduct and are disciplined in different ways.
>
> *Holifield*, 115 F.3d at 1562. The most important
> factors "'in the disciplinary context ... are the nature
> of the offenses committed and the nature of the
> punishments imposed.'" *Jones v. Gerwens*, 874 F.2d
> 1534, 1539-40 (11th Cir. 1989) ( quoting *Moore v.
> City of Charlotte,* 754 F.2d 1100, 1105 (4th Cir. 1985).
> ... If Plaintiff fails to identify similarly situated,
> nonminority employees who were treated more
> favorably, her case must fail because the burden is on
> her to establish her prima facie case. *See McDonnell
> Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Jones,*
> 874 F.2d at 1541.

137 F.3d at 1311. *See also, Lathem v. Department of Children and Youth Serv.*, 172 F.3d 786 (11th

Cir. 1999).

In the recent decision in *Manniccia*, the Eleventh Circuit elaborated:

> We require that the quantity and quality of the
> comparator's misconduct be nearly identical to
> prevent courts from second guessing employers'

> reasonable decisions and confusing apples with
> oranges.

171 F.3d at 1368

In her deposition, plaintiff testified that in a similar incident between Constance Hawkins, a black nurse, and Rhonda Watson, a white nurse, the white nurse was not even written up. (Defendants' Exhibit 6, pp.197-199). In his affidavit, Briarcliff Administrator Anthony Clements testified that the incident between Hawkins and Watson did not involve a face to face confrontation or threats of violence as did the confrontation between plaintiff and Schrader. After the dispute between Hawkins and Watson, Watson was overheard by a third person saying the word "bitch" to herself. Hawkins did not hear the comment. Defendants apparently argue that, because Watson said bitch under her breath after the dispute was over, the incident was less serious due to the lack of a face to face confrontation or threats of physical violence. Watson was written up for her conduct. This account of the incident involving Watson is not disputed by plaintiff. Rhonda Watson was not similarly situated to plaintiff as she did not engage in a face-to-face confrontation which included threats of violence. Further, both plaintiff and Schrader, a white LPN, were terminated for their conduct which involved a face to face confrontation. Plaintiff has failed to prove her *prima facie* case of discriminatory discharge.

## IV.    Retaliatory Discharge

Plaintiff alleges that she was terminated in retaliation for complaining of racial discrimination in an EEO complaint and because she sought advice from the SCLC. (Amended Complaint, ¶ 31 and ¶ 53). Because there has been no evidence that Smith was aware of the SCLC's involvement prior to plaintiff's termination, footnote 3, *infra*, the court will consider only plaintiff's

18

allegation that she was terminated in retaliation for filing an EEO complaint.  To establish a *prima facie* case of retaliation plaintiff must show: (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relationship between the two events.  *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999).  To satisfy the causal relationship requirement plaintiff need only show "that the protected activity and the adverse action are not completely unrelated."  *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994) (*quoting EEOC v. Richhold Chem., Inc.*, 988 F.2d at 1571-72 (11th Cir. 1993).

On December 10, 1996 plaintiff filed an EEOC complaint which is protected under Section 704(a).  *Rollins v. State of Florida Department of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989).  Plaintiff suffered an adverse employment action when she was terminated from her job. Plaintiff has met the "causal link" requirement of a *prima facie* case by presenting direct evidence in the form of plaintiff's testimony that Smith told her that her action of complaining to the EEOC "had some bearing on" the decision to terminate her employment.  *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997) (A review of cases where employer's actions constituted direct evidence of a discriminatory or retaliatory attitude).   Because plaintiff has established her *prima facie* case, the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action.  *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993). In a mixed motives case, an employer may not prevail "by offering a legitimate and sufficient reason for its decision if that decision did not motivate it at the time of the decision."  *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250-53 (1989); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1395 (11th Cir. 1997).  Defendants have carried their burden of proffering a legitimate, non-retaliatory reason for terminating plaintiff's employment by stating that the face-to-

19

face confrontation between plaintiff and Schrader was considered serious enough conduct that plaintiff would have been terminated regardless of consideration of any other factors and by showing that the other party to the face-to-face confrontation was also terminated.

Plaintiff then had the opportunity to refute the reason given by defendant by proving that it was pretextual. *Id.* Plaintiff, however, has failed to rebut the legitimate reason advanced by defendants by demonstrating that the proffered reason for her termination—that is, the severity of the conduct—was a pretext for retaliation.[5] Plaintiff relies on alleged comments by McClellan as evidence of racial animus establishing pretext. Teresa Tucker stated that Gail McClellan told her that "they wanted to terminate Venzola [Jones], and Queen [Dial] and [plaintiff]." (Plaintiff's Exhibit 8, p.23). Plaintiff testified that Gail McClellan told her to "watch [her] back" because "they are out to get you." (Plaintiff's Exhibit 1, p.225). Plaintiff testified the Gail McClellan also said "they are trying to get me to fire you and Queen." (Plaintiff's Exhibit 1, p.226).

Although Gail McClellan was deposed, the court has not been provided with any portion of her deposition transcript which indicates McClellan was questioned concerning these alleged comments to plaintiff and Tucker. Plaintiff was deposed on August 14, 1998 and Tucker's "statement" was taken by plaintiff's counsel on November 17, 1998. McClellan could certainly have been questioned about these comments in her November 18, 1998 deposition. In light of the fact that McClellan could have been questioned regarding the comment but apparently was not, the court will

---

[5]   Instead, plaintiff has argued that because plaintiff has met her initial burden of establishing a *prima facie* case, summary judgment should not be entered in favor of defendant on this claim. (Plaintiff's response, unnumbered p.16).

20

not consider the alleged comments of McClellan as presented by plaintiff and Tucker as such comments are inadmissible hearsay.

State Law Claims

In the amended complaint plaintiff stated claims for intentional infliction of emotional distress, wantonness (two counts), negligence, tortious interference with contract and breach of contract. In their brief in support of the motion for summary judgment defendants argued that they were entitled to summary judgment on all of these counts and provided a cursory discussion of Alabama law. In response, plaintiff stated only "the state claims asserted by plaintiff had a factual and legal basis in that plaintiff's terminations, denial of promotion, and other action taken against her by defendants were discriminatory in nature." (Response at unnumbered p.18). By failing to specifically address the state law claims, plaintiff has, in effect, conceded these claims despite her assertion to the contrary. (See plaintiff's March 1, 1999 response to defendants' reply, unnumbered p.2). Summary judgment is due to be granted with respect to the state law claims.

Based on the foregoing the court concludes that defendants' motion for summary judgment (document #30) is due to be GRANTED. A separate final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

DONE this the _18th_ day of February, 2000.

_____

PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE